104 F.3d 348
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
William LECLAIRE and Michelle Leclaire, Plaintiffs, Appellants,
v.
BLACKSTONE VALLEY ELECTRIC COMPANY, Defendant, Appellee.
Defendant, Appellee.
 No. 96-1166.
 United States Court of Appeals, First Circuit.
 Dec. 18, 1996.
 
 Mark L. Smith for appellants.
 James A. Ruggieri with whom Higgins, Cavanagh & Cooney was on brief for appellee.
 D.R.I.
 AFFIRMED.
 Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.
 STAHL, Circuit Judge.
 
 
 1
 Plaintiffs-appellants William and Michelle Leclaire commenced this diversity action against defendant-appellee Blackstone Valley Electric Company ("BVE") alleging negligence that led to injuries from electrocution.[1] Leclaire appeals the district court's grant of BVE's motion for judgment as a matter of law and its denial of his motion for new trial. Addressing each ruling in turn, we affirm.
 
 I.
 Judgment As a Matter of Law
 
 2
 At the close of Leclaire's case in chief, the district court granted BVE's motion for judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(a). The court ruled that Leclaire failed to offer evidence from which a jury could reasonably find that BVE's alleged negligence caused Leclaire's injuries. On appeal, Leclaire presses his contention that a jury could reasonably find that BVE negligently installed an electrical wire, leading to the accident which caused his injuries.
 
 A. Standard of Review
 
 3
 We review de novo the grant of a motion for judgment as a matter of law. Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1186 (1st Cir.1996); Bates v. Shearson Lehman Bros., Inc., 42 F.3d 79, 81 (1st Cir.1994). The motion is properly granted when the evidence and inferences reasonably drawn therefrom, viewed most favorably to the non-movant, permit only one reasonable conclusion. Resare v. Raytheon Co., 981 F.2d 32, 34 (1st Cir.1992). In this analysis, "we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir.1987).
 
 
 4
 Nevertheless, the non-movant's evidence "must comprise more than fragmentary tendrils: a mere scintilla of evidence is not enough to forestall a [judgment as a matter of law], especially on a claim or issue as to which the burden of proof belongs to the objecting party." Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1088 (1st Cir.1989). The non-movant "may not rely on conjecture or speculation, rather the evidence offered must make the 'existence of the fact to be inferred more probable than its nonexistence.' " Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co., 954 F.2d 19, 22 (1st Cir.1992) (quoting Carlson v. American Safety Equip. Corp., 528 F.2d 384, 386 (1st Cir.1976)).
 
 
 5
 With these principles in mind, we review the trial evidence in the light most favorable to Leclaire.
 
 B. Facts
 
 6
 On April 27, 1994, William Leclaire sustained severe injuries when a piece of aluminum coil that he was holding struck an aerial primary-distribution wire carrying some 8000 volts of electricity. At the time of the accident, Leclaire, an experienced vinyl and aluminum siding installer, was applying aluminum trim to a three-story residential building on Chester Street in Woonsocket, Rhode Island. He was working on an aluminum staging unit that he had erected in order to reach the top story. The staging unit, which Leclaire had placed approximately one foot from the front of the house, extended approximately fifty-six inches in the direction of several wires attached to two utility poles.
 
 
 7
 Working from right to left along the front of the house, Leclaire, without incident, installed beneath the roof line two segments of aluminum trim, each approximately nine-feet six-inches in length. He was situated near the left side of the house when the accident occurred. As he turned to install the third and last segment, the aluminum trim came into contact with the primary-distribution electrical wire, the top wire running between the two poles. The ensuing electrical shock threw Leclaire some twenty-five feet to the ground, leaving him with a broken back and severe burns.
 
 
 8
 BVE had upgraded the electrical service in the Chester Street area in late 1987 or early 1988. The upgrade project included the installation of new utility poles and hardware to which several electrical wires were to be attached. BVE's engineering department provided the specifications to its installation subcontractor for the placement of the primary distribution wire. For the upgrade project, BVE's design operated under the accepted standards of the National Electrical Safety Code, which required that wires such as the primary distribution wire be placed at least five feet (sixty inches) from buildings.
 
 
 9
 At the time of the upgrade, a wooden device called a "cross-arm," attached to the top of a utility pole, could have provided extra clearance between the wires and the adjacent structures. Although the upgrade specifications did not call for the use of a cross-arm, BVE's engineering department would, on occasion, authorize a deviation from its usual specification to allow for a cross-arm in order to satisfy the five-foot standard. The specifications did authorize the use of a special "MIF" bracket, if necessary, in order to meet the five-foot standard.
 
 
 10
 Following the accident, Robert Mowry, a BVE crew chief, located a burn mark on the wire, across from the left side of the house, where the aluminum trim segment had come into contact with it. Mowry found the distance from the burn mark to the point of the house closest to the wire to be sixty inches. At a later date, James O. Corriveau, a witness for Leclaire, measured the distance from the wire to the house at both the extreme right and left sides of the house front. Corriveau found that the wire was "roughly around" fifty-three to fifty-four inches from the right side, and "around sixty-two inches, somewheres around there" from the left.[2]
 
 
 11
 Leclaire's expert witness, Donald W. Zipse, testified that because the wire failed to meet the five-foot standard on the right side of the house, the wire was not safely installed. Zipse conceded, however, that at each point where the wire was five feet or more from the house, it did satisfy the clearance standard. Zipse further testified that, in 1987 or 1988, he had on one occasion installed an insulated version of an aerial primary distribution wire similar to the one on Chester Street. He did not testify why, when or where he used the insulated wire, nor did he explain under what circumstances insulated wires would or should be used.
 
 C. Discussion
 
 12
 At trial, Leclaire attempted to establish that BVE's placement of the electrical wire violated the five-foot clearance standard of the National Electrical Safety Code. On the Rule 50(a) motion, the district court found that the only evidence tending to show that BVE had failed to meet any applicable standard of care was the clearance shortfall located on the right side of the house, well away from the contact point between the aluminum strip and the wire. The uncontroverted evidence established, however, that the distance between the house and the contact point was five feet. Because Leclaire did not prove that the failure to meet the clearance standard at a different point caused the accident, the court granted BVE's motion for judgment as a matter of law.
 
 
 13
 Upon careful review of the record, we agree that there is no evidence from which a jury could rationally find, by a preponderance of the evidence, that the failure to meet the clearance standard at the right side of the house caused or contributed to the accident at the left, where the standard was shown to have been satisfied. The absence of such evidence precludes Leclaire from prevailing on a negligence claim based on a violation of the clearance standard. See Radcliffe v. Haun, 593 So.2d 824, 826 (La.Ct.App.1992) (finding no evidence of causation where electric company's power-line clearance infractions occurred at points other than plaintiff's location when he was injured), writ denied, 599 So.2d 313 (La.1992); see also Kennedy v. Tempest, 594 A.2d 385, 388 (R.I.1991) (explaining that a plaintiff in a negligence action must establish not only duty and breach, "but also that the defendant's negligence was the proximate cause of the plaintiff's injury"); Schenck v. Roger Williams Gen. Hosp., 382 A.2d 514, 517 (R.I.1977) (explaining that a verdict for plaintiff in negligence action absent competent evidence establishing a causal connection would only "be based on conjecture and speculation").
 
 
 14
 Leclaire does not dispute this conclusion as a matter of law or logic; he argues, instead, that the jury was free to disregard Mowry's testimony that the clearance at the point of contact was sixty inches. It is clear, however, that in the context of a Rule 50(a) motion, "a bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient to resist judgment as a matter of law on an issue as to which the party resisting judgment bears the burden of proof." Favorito v. Pannell, 27 F.3d 716, 721 (1st Cir.1994) (upholding grant of Rule 50(a) motion where non-movant "relied entirely on the totally unsupported speculation that a jury might disbelieve [a witness's] uncontroverted testimony"). This rule has no less application where, as here, the party resisting judgment introduced the uncontroverted evidence.
 
 
 15
 In a related vein, Leclaire asserts that, on a motion for judgment as a matter of law, the district court must consider only evidence favorable to him, and thus, it should have disregarded entirely Mowry's testimony establishing the five-foot clearance at the point of the burn mark. Leclaire's argument misconstrues the law. While the district court (and this court on review) must view the evidence in the light most favorable to the non-movant, the analysis does not necessitate the complete disregard of uncontroverted evidence that happens to be unfavorable to that party. See Layne v. Vinzant, 657 F.2d 468, 472 (1st Cir.1981) ("[W]hile, on a defendant's motion [for judgment as a matter of law], it is axiomatic that the evidence is to be viewed in the light most favorable to the plaintiff, the 'field of vision' encompasses, to a degree, uncontradicted evidence introduced by the defense.").[3]
 
 
 16
 In the alternative to his argument that the jury could disbelieve Mowry's testimony, Leclaire highlights evidence that, he claims, reasonably conflicts with the five-foot measurement. Specifically, Leclaire asserts that because the wire was short of the standard on the right side, but exceeded the standard on the left, the jury could have found that the distance from the contact point was less than five feet. We disagree. Leclaire presented only rough measurements coupled with his approximate location (as he held the nine-foot six-inch aluminum trim segment), some two-thirds down towards the left side of the house, at the time of the accident. He did not provide, with any specificity, a measurement of the burn mark location as between the right and left sides of the house. Finally, he introduced no testimony to assist the jury in making any mathematical calculation to support the asserted fact. A jury finding cannot be based on this type of unguided reasoning, and on this state of the evidence, a jury could not reasonably find that the wire was less than five feet from the house at the point of contact.
 
 
 17
 Leclaire finally argues that the jury could have found that BVE breached a duty independent of the clearance standard. To this end, he asserts that "common sense" dictates that BVE should have foreseen that the Chester Street residence would require periodic maintenance such as siding, and thus, BVE should have insulated the primary distribution wire, or placed the wire farther from the building. The evidence presented, however, would not support a finding of negligence on this theory.
 
 
 18
 Under Rhode Island law, it is well-established that "a reasonable and legitimate inference that someone was negligent is not necessarily warranted by the mere happening of an accident." Montouri v. Narragansett Elec. Co., 418 A.2d 5, 9 (R.I.1980). Rather, the plaintiff must produce sufficient, competent evidence of the essential elements of a negligence claim, including the defendant's duty to the plaintiff and the breach of that duty. See id. at 9-10; Radigan v. W.J. Halloran Co., 196 A.2d 160, 163 (R.I.1963) ("In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury" (quotation and citation omitted)). While Rhode Island courts recognize that companies distributing electricity must exercise great care in their operations, see Rott v. Blackstone Valley Gas & Elec. Co., 106 A.2d 251, 255 (1954), the evidence presented must be sufficient to allow a finding that BVE failed to exercise such a degree of caution in this case.
 
 
 19
 Leclaire did not produce evidence sufficient to prove that BVE negligently failed to insulate the primary distribution wire. In Rhode Island "there is no absolute duty to insulate wires carrying electricity." Rott, 106 A.2d at 254. In Rott, the plaintiff claimed that he informed the electric company that high tension wires were interfering with a construction project, but the company took no steps to diminish the danger. Id. at 253. The court held that, under the alleged facts, a duty to insulate high tension wires could arise "by reason of special circumstances" of which the defendant had knowledge. Id. at 254. Here, no such circumstances were shown. Leclaire did not show that BVE had knowledge of his siding project on Chester Street; indeed, Leclaire admitted that, although he had previously informed electric companies when wires interfered with his work, he failed to do so here. Moreover, as indicated above, the expert Zipse's unembellished testimony that he once used an insulated wire in 1987 or 1988 is utterly unhelpful in this regard.
 
 
 20
 Leclaire also failed to show that BVE violated some duty to place the wire farther away from the Chester Street residence. The evidence that special brackets or cross-arms were available to satisfy the five-foot clearance standard does nothing to prove that BVE violated a duty to exceed that standard through the use of those alternatives. No witness opined that the five-foot standard was inadequate, nor was there evidence even hinting at what a specific "appropriate" distance from the house would have been. On the contrary, abundantly clear from the record is Leclaire's attempt to establish negligence based on the violation of the five-foot standard. We are unpersuaded by his endeavor to fashion a different theory of negligence from the evidence.
 
 II.
 Motion For a New Trial
 
 21
 Leclaire appeals the district court's denial of his motion for a new trial, purportedly sought under the authority of Fed.R.Civ.P. 50(c)(2). He advances no arguments other than those which we have already found unavailing. Thus, assuming but not deciding that a Rule 50(c)(2) motion for new trial will lie where, as here, a case has not gone to the jury,[4] we find no abuse of discretion in the district court's denial of the motion.
 
 III.
 Conclusion
 
 22
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 23
 Costs to appellees.
 
 
 
 [1]
 For simplicity, and because Michelle Leclaire's claims are derivative of those of William Leclaire, we refer to the appellants collectively as "Leclaire."
 We note also that Leclaire initially joined E.W. Audet & Sons, Inc. ("Audet"), originally a party-defendant, in this appeal. Leclaire conceded at oral argument before this court, however, that he failed to produce evidence to establish any negligence on the part of Audet. Accordingly, on November 8, 1996, we ordered this appeal dismissed as to Audet. While the case proceeds as to BVE only, Audet is entitled to costs on appeal pursuant to Fed. R.App. P. 39.
 
 
 [2]
 Corriveau also testified that, at the extreme left-hand side of the house, the wire was some forty inches below the roof line
 
 
 [3]
 Leclaire cites Samuels v. Hood Yacht Sys. Corp., 70 F.3d 150, 152-53 (1st Cir.1995), to support his claim that he should not be bound by his witness's unfavorable testimony. In Samuels, plaintiffs' witness testified ambivalently both in favor of and adverse to the plaintiffs' case Id. at 152. We reversed the district court's directed verdict, explaining that the plaintiffs "were not bound by their expert's reversal," but rather, "a witness may be believed in part and disbelieved in part ... [w]here [the witness] was self-contradictory." Id. at 152, 153 (citation omitted). The absence of such self-contradiction here renders Samuels inapposite
 
 
 [4]
 The advisory committee's note to the 1963 amendment of Rule 50 suggests that relief under subsection (c)(2) is limited to a verdict-winner who loses on a renewed motion for judgment as a matter of law. Fed.R.Civ.P. 50 advisory committee's note